**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | |
|---|---|
| GREEN ESTATE, LLC, | ) |
| | ) |
| Plaintiff, | ) Case No.   4:26-cv-1256 |
| | ) |
| v. | ) |
| | ) |
| CITY OF MEXICO, MISSOURI, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Green Estate, LLC ("Green Estate"), brings this action against Defendant City of Mexico, Missouri (the "City") in order to ensure the City maintains its contractual commitments to Green Estate and its obligations that run to the citizens of Mexico, Missouri, in connection with a Restriction Agreement As To Gift Of Land, dated November 15, 2005 (the "Agreement"). *See* **Exhibit A**. Green Estate alleges as follows:

## INTRODUCTION

1. For decades, the A.P. Green Fire Brick Company, founded by Allen P. Green, was one of the world's largest manufacturers of heat-resistant refractory products and one of the most significant employers in Audrain County, Missouri.

2. Allen P. Green and his family previously owned approximately 200 acres of land in the City. Those 200 acres included the residence of Allen P. Green, three homes occupied by Allen P. Green's descendants, and an expansive park land consisting of open grass fields, wooded areas, five pre-war concrete bridges, and ponds where members of the Green family would fish, boat, and play. In the mid-1950s, 145 acres of this park land was transferred to the A.P. Green Fire Brick Company.

3.      By the early 2000s, the A.P. Green Fire Brick Company's successor entity was in bankruptcy, and the land it owned was part of the bankruptcy proceedings. In 2002, Allen P. Green's great-grandson, Renny Smith—the managing member and today the sole member of Plaintiff Green Estate—decided to purchase the land in the bankruptcy proceedings in order to maintain his family's legacy and its historic connection with Audrain County.

4.      In 2005, Green Estate agreed to title of 143 acres of the land previously owned by the A.P. Green Fire Brick Company to the City pursuant to the terms of the Agreement (the land transferred via the Agreement is hereafter referred to as the "Property").

5.      Green Estate did not ask for any money in exchange for the Property. Rather, Green Estate required that the transfer be conditioned upon the City's agreement to set aside a large portion of the Property to be used solely for public recreational purposes, which was to be named Green Estate Park (the "Park"). The Agreement also requires that the City perform all maintenance and upkeep on the Property, including upkeep and repair of all the Park's bridges, paved roads, fences, and gates.

6.      At the same time, the Agreement permitted the City to sell a smaller portion of the Property to be developed for residential purposes. It was the parties' joint intent that the funds generated for the City from these residential sales would be used toward the required maintenance and upkeep of the Park.

7.      In January 2006, the Mexico Area Chamber of Commerce honored Renny Smith and his former wife, Tiina B. Smith, with its 2005 Philanthropic Award in recognition of this historic conditional donation and conveyance of land. In a statement responding to this honor, the Smiths stated that the estate's "majestic trees, expansive lawns, [and] sparkling ponds" "ha[d] been

a special place for five generations of the Green family[,]" and that they hoped "all future generations of Mexico residents will have the pleasure of enjoying its splendor and beauty."

8.      The City has failed to honor its contractual commitments and the goals of Green Estate and Renny Smith in conveying the Property to the City. For instance, the City has entirely neglected a pond in the Park known as Rabbit's Foot Lake, even though the City is obligated to maintain the pond for the public's recreational use. Today, the water of Rabbit's Foot Lake, where the Green family previously boated and fished, is overrun with scum due to neglect, and the pond itself is nearly inaccessible due to overgrown invasive vegetation that surrounds it. There are two historic stone bridges at each end of the pond, and both are in disrepair and shrouded by overgrown vegetation. Today, the City pretends as if the pond is not its responsibility at all. Immediately in front of the pond's bridges lies a "No Trespassing" sign, as if Rabbit's Foot Lake is not owned or controlled by the City and subject to the terms of the Agreement—but it is.

9.      The City has also failed to maintain other large areas of parkland for the public's recreational use.  The grass in wide swaths of the Park is overgrown, in violation of the City's own ordinance governing the maximum height of grassy fields. Prior to the 2005 conveyance, the City cited that ordinance to Green Estate when it required Green Estate to use its own resources to mow the Property. But after the Property was conveyed to the City, the City allowed large areas of the Park to become overgrown with waist-high grass, significantly reducing the total amount of grassy area that the public can enjoy in the Park. The City has also failed to remove numerous dead trees in the Park's grassy areas, which pose a risk to any member of the public that comes near them. Those unremoved dead trees further reduce the grassy area available for the public's recreational use.

3

10.     The City has violated the Agreement in numerous other ways as well. The City has improperly enlarged the size of a maintenance shed at the center of the Park; the City has failed to adequately maintain the historic split-rail fence that encircles the Property; the City has failed to properly maintain a third historic stone bridge in the Park; and the City has failed to maintain signage required under the Agreement's clear terms. All of these actions and inactions constitute breaches of the Agreement.

11.     Since the 2005 conveyance, the City has not been transparent with Renny Smith regarding the steps the City has taken or plans to take in order to comply with the City's covenants in the Agreement. Prior to the filing of this Complaint, the City explicitly refused to take any steps to fix the deficiencies identified herein. Green Estate now, as a last resort, brings this action to enforce the Agreement according to its terms.

<u>**THE PARTIES**</u>

12.     Plaintiff Green Estate is a limited liability company with one member, Warren (Renny) Smith, Jr. Renny Smith resides in and is domiciled in the State of Massachusetts. Green Estate is a party and signatory to the Agreement, and is identified in the Agreement as the "Donor" conveying the Property subject to the "covenants, warrants, restrictions, conditions precedent, condition subsequent, and conditions of reversion set forth in" the Agreement. **Exhibit A** at 1.

13.     Defendant City of Mexico, Missouri is a municipal corporation and political subdivision in the State of Missouri, and is thus a citizen of the State of Missouri. The City is a party and signatory to the Agreement, and is identified in the Agreement as the recipient of the Property subject to the Agreement's restrictions, warrants, and covenants, and conditions of reversion. **Exhibit A** at 1. The City does not have sovereign immunity for any of the claims asserted in this Complaint because each claim is either based on the City's breach of contract

4

and/or seeks solely equitable relief. *Kunzie v. City of Olivette*, 184 S.W.3d 570, 575 (Mo. 2006) ("Sovereign immunity does not apply to suits for breach of contract."); *Wyman v. Missouri Dep't of Mental Health*, 376 S.W.3d 16, 23 (Mo. App. W.D. 2012) (sovereign immunity statute does not apply to "claims for equitable relief").

**JURISDICTION AND VENUE**

14.     The Court has subject matter jurisdiction over the claims in this Complaint under 28 U.S.C. § 1332(a) because the parties are citizens of different States and, for the reasons described below, the matter in controversy exceeds $75,000.

15.     Venue is proper under 28 U.S.C. § 1391(b)(1) because the City, the lone defendant in the action, is located in this District. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(2) because the Park, which is the subject of this action, is located in this District.

**FACTUAL ALLEGATIONS**

**I.     The History of Allen P. Green's Estate and Green Estate Park.**

16.     Allen P. Green originally owned approximately 200 acres of land in the City. Mr. Green was the founder, director, and chairman of the board of the A.P. Green Fire Brick Company, a manufacturer of high-temperature refractory products—*i.e.*, specialized bricks designed to withstand extremely high temperatures. At its height in the mid-20th century, the A.P. Green Fire Brick Company was a world-wide leader in the refractories industry and one of the largest private employers in Audrain County.

17.     Multiple generations of the Green family grew up on this 200-acre property, which contains rolling hills, open grasslands, secluded wooded areas, and a number of freshwater ponds where the Green family would boat and fish.

18.     The land also contains five matching stone bridges constructed in the 1930s. The bridges were carefully designed and engineered by Allen P. Green, and each is adorned with stone

5

railings. Two of those bridges are at each end of a pond called Rabbit's Foot Lake. One of those bridges has a concrete retaining wall intended to channel water into the pond. The other bridge near the pond has a spillway underneath into a nearby creek, which runs under the bridge. A boathouse previously abutted the pond.

19.     After the death of Mr. Green and his wife, Josephine B. Green, in the 1950s, title to 145 acres of the land transferred to the A.P. Green Fire Brick Company.

20.     By 2002, the A.P. Green Fire Brick Company's successor entity was in bankruptcy proceedings.

21.     In 2002, one of Mr. Green's great-grandsons, Renny Smith, purchased in the bankruptcy proceedings the 145 acres of land owned by the A.P. Green Fire Brick Company's successor entity. Renny Smith made this purchase out of his own assets, in order to ensure the park land was not sold to a commercial buyer in the bankruptcy proceedings.

22.     Renny Smith then conveyed the land to Green Estate, a limited liability company under his control.

**II.     Green Estate's Philanthropic Conveyance of the Park to the City of Mexico in Exchange for Specific Ongoing Commitments by the City to Maintain the Park for the Public's Recreational Use.**

23.     On November 15, 2005, Green Estate and the City executed the Agreement for the conveyance to the City of 143 acres of the land Renny Smith purchased in the bankruptcy proceedings (*i.e.*, the Property).

24.     On December 19, 2005, Green Estate executed and delivered to the City the General Warranty Deed (the "Deed"). *See* **Exhibit B**.

25.     The Agreement was the product of years of negotiations between Renny Smith and representatives of the City, as Mr. Smith worked to ensure that the majority of the Property would be maintained as a park that could be enjoyed and used recreationally by the public.

6

26.     The consideration from the City to Green Estate in exchange for the Property included restrictive covenants governing how the City was permitted to use and develop the Property after the conveyance. The Agreement specifically provides that the Property is "donated subject to certain restrictive covenants as to the use and development, which the City hereby accepts and warrants and represents that it shall respect and fulfill[.]" **Exhibit A** ¶ 4.

27.     The text of the Agreement provides that a portion of the Property was "to be used only for public recreational purposes" and was "to be known as 'Green Estate Park.'" *Id.* at 1; *see also id.* at Agreement Ex. 4.1(c). The portion of the Property conveyed for this purpose is referred to in the Agreement as the "Park Land." *Id.* ¶ 4.1. As the Agreement states, it was Green Estate's intent that the Park Land "be dedicated to and exclusively used for recreational use by the public and citizens of the City of Mexico, Missouri[,] as a park, arboretum, and natural area." *Id.* Ex. 4.1(c)(1). The Park Land consists of approximately 92 acres.

28.     The Agreement separately provides that another, smaller portion of the Property can be "develop[ed]" as a "residential subdivision." *Id.* ¶ 4.3. This portion of the Property is referred to in the Agreement as the "Development Land." *Id.* ¶ 4.3.

29.     The Agreement states that there can be "no commercial development . . . whatsoever" on the Development Land. *Id.* Ex. 4.3.1(c)(2). And the Agreement contains restrictions on the size of residential lots that can be sold, how the residential lots are to be used, and how any residences are to be designed and constructed on any lots sold. *See generally id.* Ex. 4.3.1(c).

30.     The Deed provides the legal descriptions of the "Park Land" and "Development Land." *See* **Exhibit B** at 7-8.

7

31.    The parties' joint intent in carving out the Development Land from the Park Land, and permitting the City to develop this smaller portion of the Property for residential use and development, was to provide the City with an endowment that could be used to maintain and repair the Park in accordance with the Agreement's restrictive covenants.

32.    The Agreement's restrictive covenants include:

a)    **Land Use Restrictions.**   The City is obligated to use the Park Land conveyed in the Agreement "exclusively for public recreational purposes within the City's park system." **Exhibit A** ¶ 4.1; *see id.*, Ex. 4.1(c)(1). The purpose of this restriction was to ensure the Park Land was "dedicated to and exclusively used for recreational use by the public and citizens of the City of Mexico, Missouri." *Id.*, Ex. 4.1(c)(1).

b)    **Maintenance and Upkeep.** The City covenanted that it would "assume and perform all maintenance and upkeep" on the Property after the conveyance. **Exhibit A** ¶ 4.2. The Agreement explicitly provides that the City is to (1) maintain and upkeep "the paved road and the 5 bridges" on the Property, and (2) maintain and repair "the current split rail fence which surrounds" the Property and the "Churchill Gate"[1] in their "current condition and character with the same or similar materials." *Id.*

---

[1]    Allen P. Green had a formal entryway to the property constructed in or around 1946 featuring wrought iron gates and brick masonry walls, in anticipation of a visit by Prime Minister Winston Churchill and President Harry S. Truman. Mr. Churchill and Mr. Truman were originally expected to visit Mr. Green's estate during Mr. Churchill's trip to Missouri in which he gave his famous "Iron Curtain" speech in Fulton, Missouri. The intended visit to Mr. Green's estate never materialized, but the Churchill Gate remains.

c)      **Restriction on Additional Construction.** The Agreement provides that "[n]o structures, buildings or additional roads shall be constructed" in the Park Land, and that a maintenance shed on the property at the time of the conveyance can be "kept, maintained, and improved so long as its 'footprint' does not materially expand." **Exhibit A**, Ex. 4.1(c)(3).

d)      **Commemorative Signage.** The Agreement provides that commemorative signs are to be established at the main entrance to the Park and any additional entrances later constructed. The Agreement includes an exhibit detailing the text that must be used for these entryway signs, which includes information to the public regarding the history of the Park, Allen P. Green, and the A.P. Green Fire Brick Company. **Exhibit A** ¶ 4.4 & Ex. 4.4(b). The Agreement further provides that a commemorative sign must be placed near the Churchill Gate explaining the gate's history, and the Agreement includes the text that must be used for this sign as well. *Id.* ¶ 4.4 & Ex. 4.4(a).

e)      **Weight Limit Signage**. The Agreement provides that each bridge on the Property must have signage "as to their appropriate weight limit." **Exhibit A** ¶ 4.2.

33.      The Agreement further provides that any "Development [L]and" that is "not developed by the City for residential purposes . . . shall be subject to the same terms and conditions as the Park Land" and "shall continue to be used exclusively as a public recreational area." **Exhibit A** ¶ 4.3.

34.     In the Agreement, the City "acknowledge[d] that" the Property was being donated "subject to [the] restrictive covenants as to use and development," which the city "warrant[ed] and represent[ed] that it [would] respect and fulfill after the conveyance." **Exhibit A ¶ 4.**

35.     The Agreement also provides Green Estate a reversionary interest in the Property in the event the City violates any of the Agreement's material terms or conditions. Specifically, the Agreement provides that "if any of the material terms or conditions of these restrictive covenants are violated," Green Estate "may give written notice to the City of the [v]iolation." **Exhibit A ¶ 4.** If the violation is not "corrected or if there is not substantial progress towards such correction within ninety (90) days of the receipt of such [n]otice, then the Property then belonging to the City or any entity controlled by the City shall by operation of law or Order of court revert to and be vested in" Green Estate. *Id.*

36.     Because the City's obligations in the Agreement (and the commensurate reversionary interest) were to be performed after the Deed was conveyed to the City, those obligations did not need to be copied into the Deed to remain effective and enforceable post-conveyance. Although it was not a legal requirement, the Agreement states that the "restrictive covenants [would] be expressly set forth in the deed to the Property" nonetheless. **Exhibit A ¶ 4.** But because of a mutual mistake between the parties, not all of the Agreement's terms were ultimately copied into the Deed.

37.     The Mexico Area Chamber of Commerce awarded Renny Smith and his former wife, Tiina Smith, the chamber's 2005 Philanthropic Award in recognition of the donation and conveyance of the Property.

### III.     The City's Breaches of the Agreement.

38.     The City is currently in breach of material terms of the Agreement in numerous ways. At bottom, after conveyance of the, Deed the City has failed to perform the maintenance

and upkeep required to ensure the Park continues to be dedicated exclusively to the public's recreational use, as required by the Agreement's clear terms.

39. Renny Smith and/or Green Estate's counsel have visited the Park numerous times since the fall of 2024, including a final visit immediately before the filing of this Complaint. On each visit, they observed the numerous violations of the Agreement discussed herein.

40. *First*, the City has completely abandoned its obligation to maintain Rabbit's Foot Lake and the two historic bridges at each end of the pond. The City has permitted the trees, bushes, and weeds surrounding the two bridges to overgrow onto the bridges such that they are nearly entirely shrouded, which has the practical effect of cutting off any reasonable access to Rabbit's Foot Lake. It would be reasonable for a passerby to not even realize that within the overgrown bushes and trees lie two historic pre-war bridges that lead to a body of water previously enjoyed by the Green family.

41. Rabbit's Foot Lake itself has been completely neglected. It is today overgrown with weeds, mud, and scum. To the extent a park visitor were able to locate Rabbit's Foot Lake, no visitor would be able to use or enjoy the body of water recreationally.

42. Even worse, the City has been falsely representing to the Park's visitors that this area is privately-owned and not part of the Park at all.

43. The City has placed a sign placed immediately in front of the (obscured) entrance point to Rabbit's Foot Lake that reads "Boundary – Private Property Beyond This Sign – Please Do Not Trespass[,]" as seen in this photograph:

11



Photograph #1 – "No Trespassing" sign at the (virtually inaccessible) entrance point to Rabbit's Foot Lake.

44.     This sign is a misrepresentation. Rabbit's Foot Lake is found in the southeast corner of the Park near the intersection of Teal Lake Road and Huntingfield Drive. It is part of the Property conveyed to the City in the Agreement and is within the Park Land, per the legal description of the "Park Land" in the Deed. *See* **Exhibit B** at 7. Rabbit's Foot Lake is thus currently owned and controlled by the City, which can be confirmed via publicly-available information reflecting the real property interests in Audrain County.

45.     Photograph #2 is a screenshot from IntegrityGIS, the publicly-available mapping software platform used by Audrain County at www.audraincounty.org/gis-mapping. Rabbit's Foot Lake can be seen in Photograph #2 at the bottom righthand portion of the shaded area, near the

12

corner of Teal Lake Road and Huntingfield Drive. As reflected in the top left corner of this screenshot, this area is owned by the "City of Mexico."



Photograph #2 – Screenshot of IntegrityGIS map of Audrain County (available at https://audraingis.integritygis.com/H5/Index.html?viewer=audrain (last visited August 5, 2026)).

46.     Because it is part of the Park Land area of the Property, Rabbit's Foot Lake is subject to the terms of the Park Land restrictions contained in the Agreement. The City has nonetheless neglected Rabbit's Foot Lake, and today it is virtually inaccessible to the public and cannot be used recreationally.

47.     **Second**, a significant portion of the Park is unusable by the public because of overgrown grass and dead trees.

48.     During the visits to the Park described above, Renny Smith and/or Green Estate's counsel observed (1) numerous dead trees in the middle of open grassy areas that the City had failed to remove, which posed a danger to anyone in their vicinity because of the risk they might fall; and (2) large portions of land where the grass had grown to waist-height, rendering the areas completely impassable and unusable to the public. These deficiencies significantly shrink the grassy area available for the public's use and enjoyment.

13

49.    The City's failure to mow large portions of the grassy area in the Park stands in contrast to the City's instructions and demands communicated to Renny Smith prior to Green Estate's conveyance of the Park to the City. After Renny Smith's purchase of the Property in bankruptcy but prior to Green Estate's conveyance, Renny Smith spent over $30,000 per year to maintain the park areas, including mowing all of the open grassy areas. In a conversation with the former city manager, Renny Smith asked if he could cease mowing certain parts of the grassy areas. The former City Manager responded that he must continue to mow all of the grass on the Property, because any failure would violate a city ordinance that classifies grass or weeds over eight inches in height as a public nuisance. *See* Mexico City Ordinance, Chapter 26, Article III, Section 26-169(a)(2).

50.    After the conveyance, the City permitted large swaths of grassy areas in the Park to grow to well over eight inches, contrary to the former City Manager's previous message to Renny Smith.

51.    ***Third***, the City has expanded the maintenance shed identified in the Agreement to well beyond its original "footprint," in violation of the Agreement.  See **Exhibit A**, Ex. 4.1(c)(3).

52.    Pursuant to a March 2003 appraisal commissioned by Green Estate, the size of the maintenance shed prior to the 2005 conditional donation was 24 feet by 30 feet.

53.    During their visits to the Park noted above, Renny Smith and/or his counsel observed that the maintenance shed is now over double this size. Based upon these observations, it is believed the maintenance shed has been expanded to now be over 70 feet long.

54.     ***Fourth***, the City has not maintained the split rail fence or the bridges within the Park in accordance with the requirements in the Agreement.

14

55.     Portions of the split rail fence that surrounds the Property are in disrepair or completely absent. In some places rails have become dislodged from posts such that half of the rail rests on the ground. In other places, the split-rail fence is on the verge of collapse or missing entirely.

56.     In addition, three bridges (including the two near Rabbit's Foot Lake discussed above) are located in the Park, and thus within the Park Land area subject to the Agreement's Park Land restrictions. None of these three bridges has been adequately maintained.

57.     After purchasing the Property in the bankruptcy proceedings, Renny Smith commissioned an appraisal of the Property and its necessary improvements. That appraisal was completed in March 2003. The appraisal states that each of the bridges on the Property has an expected useful life of 20 years—or until the year 2023. It is now three years after the expected useful life of these bridges elapsed. Nevertheless, since acquiring the Property in 2005, the City has performed no meaningful repair or maintenance work on the three bridges within the Park to reinforce them and extend their expected useful life.

58.     The City's neglect is apparent from a review of the bridges. The three bridges within the Park are chipped and in need of tuckpointing and other repair work. Upon information and belief, because of the City's neglect of these bridges, a resident of a subdivision in the nearby Development Land attempted to patch some of the holes on the bridge at the resident's personal expense.

59.     *Fifth*, the City has failed to ensure that at each entrance to the Park there is a sign setting forth the history of the Property with respect to Allen P. Green and the A.P. Green Fire Brick Company, as required by the Agreement. *See* **Exhibit A** ¶ 4.4; *see also id.*, Ex. 4.1(c)(5). Today, that contractually-required sign is at only one of the Park's three entryways.

60.    ***Sixth***, the City has failed to include the weight limit signage required by the Agreement on any of the bridges located within the Park. **Exhibit A** ¶ 4.2.

IV.    **Green Estate's Notice to the City of The Deficiencies and the City's Failure to Correct Them.**

61.    On September 24, 2024, counsel for Green Estate provided written notice to Mexico's City Manager of the City's violations of the Agreement, in accordance with Paragraph 7.1 of the Agreement. Further written notice of the City's violations was provided to the City's municipal counsel on October 15, 2024.

62.    Notice of these breaches was also provided during a joint in-person visit to the Park by counsel for both the City and Green Estate in the fall of 2025, and again in discussions among counsel in early 2026.

63.    As of the date of the filing of this action, the City has failed to correct, and has not made any progress toward correcting, the material breaches described in Green Estate's written notices and described herein. Indeed, the City has outright refused to take any steps to remediate its breaches of the Agreement.

64.    The value of the object of this litigation exceeds $75,000. The maintenance and repairs necessary to bring the City into present and ongoing compliance with the Agreement exceeds $75,000. This allegation is based upon (1) Renny Smith's experience with maintenance and upkeep of the Property prior to the 2005 Agreement; (2) a March 2003 appraisal of improvements to the Property obtained by Renny Smith, which stated that the fair market value of the then-present improvements to the Property's roadway, bridges, split-rail fence, utility shed and iron gates and brickwork alone exceeded $75,000; and (3) Green Estate's knowledge of the repairs that would be needed to ensure the Property is in compliance with the terms of the Agreement and the local market rate for such repairs.

65.     In addition, Green Estate's reversionary interest in the Property exceeds $75,000. A November 2, 2005, appraisal of the Property estimated the Property's fair market value to be $1,215,000. The Park Land, as that land is described in the Deed, comprises over half of the Property included in this appraisal. *See* **Exhibit B** at 7-8.

### CAUSES OF ACTION

### Count I – Breach of Contract

66.     Green Estate incorporates by reference the preceding allegations as if fully set forth herein.

67.     Green Estate and the City executed the Agreement in November 2005, in which Green Estate agreed to convey the Property to the City in exchange for certain ongoing covenants, warrants, and restrictions on the City's use and development of the Property, which are detailed in the Agreement. *See* **Exhibit A** ¶¶ 4.1, 4.2, 4.4, Ex. 4.1(c).

68.     The Agreement satisfies the requirements of R.S. Mo. § 432.070 for a valid contract with a city or municipal corporation: (1) the City has the power to enter into contracts for land (*see* R.S. Mo. § 77.010); (2) the consideration was to be performed after execution; and (3) the Agreement, including its consideration, is written and signed by the parties' authorized representatives.

69.     Green Estate conveyed the Property to the City and therefore performed its obligations pursuant to the Agreement.

70.     The City has breached its ongoing obligations under the Agreement in numerous ways. The City has (1) failed to dedicate, use, and maintain the Park Land and Development Land still under its control for public recreational use, including by (a) wholly neglecting Rabbit's Foot Lake and the two bridges at each end of the pond and allowing them to fall into disrepair; and (b) by failing to remove dead trees and adequately mow grassy areas, which has greatly reduced the

17

total amount of grassy areas that the public can use recreationally; (2) expanded the maintenance shed in the Park to well beyond its footprint, in violation of the Agreement; (3) failed to maintain the split rail fence that circles the Property and the bridges within the Park in accordance with the terms of the Agreement; (4) failed to ensure that the commemorative signage identified in the Agreement is posted at each entrance to the Park; and (5) failed to post weight limits for the bridges within the Park.

71.     Because the City's breaches have prevented the citizens of the City and Audrain County from using and enjoying the full scope of the Park, the City's breaches relate to the fundamental basis for Green Estate's conveyance of the Property and therefore constitute breaches of material terms of the Agreement.

72.     Green Estate has been damaged as a result of the City's violations of the Agreement because the City has thwarted Green Estate's intent in entering the Agreement—*i.e.*, ensuring that the Park Land, as described in the Agreement, be maintained for the use and enjoyment of the citizens of the City and Audrain County while honoring the legacy of Allen P. Green and the Green family.

73.     Green Estate provided notice to the City of the material violations and contractual breaches discussed herein. More than 90 days have elapsed since Green Estate provided that notice, and the City's violations have not been corrected or addressed, nor has substantial progress been made toward correcting or addressing them.

74.     Green Estate respectfully requests all damages available by law for the City's breaches of contract, including but not limited to:

➢ Specific performance and/or injunctive relief, requiring the City to immediately cease its ongoing breaches of the Agreement discussed herein, and honor and perform its ongoing covenants and obligations set forth in the Agreement.

➢ Alternatively, a declaration that because the City has failed to correct or make substantial progress toward correcting its material violations of the Agreement within 90 days of Green Estate's notice of the violations, fee title did revert to and is now vested in Green Estate with respect to the portions of the Property belonging to the City or any entity controlled by the City, pursuant to Green Estate's reversionary interest in the Agreement. *See* **Exhibit A** ¶ 4, Ex. 4.1(c)(7). The land to which fee title did revert to and is now vested in Green Estate and which Green Estate is the legal owner of—*i.e.*, the portions of the Property subject to Green Estate's reversionary interest—is described in **Exhibit C**, which is based upon the legal descriptions of the Property in the Agreement and the Deed.

➢ Green Estate's attorneys' fees and costs in connection with this action.

➢ Any other available relief that the Court deems just and proper.

### Count II – Breach of the Covenant of Good Faith and Fair Dealing

75. Green Estate and the City executed the Agreement in November 2005, in which Green Estate agreed to convey the Property to the City in exchange for certain ongoing covenants, warrants, and restrictions on the City's use and development of the Property, which are detailed in the Agreement. *See* **Exhibit A** ¶¶ 4.1, 4.2, 4.4, Ex. 4.1(c).

76. The Agreement satisfies the requirements of R.S. Mo. § 432.070 for a valid contract with a city or municipal corporation: (1) the City has the power to enter into contracts for land (*see* R.S. Mo. § 77.010); (2) the consideration was to be performed after execution; and (3) the

Agreement, including its consideration, is written and signed by the parties' authorized representatives.

77. Green Estate conveyed the Property to the City and therefore performed its obligations pursuant to the Agreement.

78. The primary purpose of the Agreement was that the City would use a portion of the conveyed land—the land designated in the Agreement as the Park Land—for public recreational purposes, and thus would neither develop the Park Land for any other purpose or allow any portion of the Park Land to fall into disrepair.

79. To further this purpose, the Agreement both forbids the City from constructing any structures, buildings, or additional roads within the Park Land, and also requires the City to complete all necessary maintenance and upkeep on the Property.

80. The City has exercised any discretion afforded to it under the terms of the Agreement in a manner that evades the spirit and purpose of its ongoing obligations under the Agreement.

81. Specifically, the City has: (1) failed to dedicate, use, and maintain the Park Land and Development Land still under its control for public recreational use, including by (a) wholly neglecting Rabbit's Foot Lake and the two bridges at each end of the pond and allowing them to fall into disrepair; and (b) by failing to remove dead trees and adequately mow grassy areas, which has greatly reduced the total amount of grassy areas that the public can use recreationally; (2) expanded the maintenance shed in the Park to well beyond its footprint, in violation of the Agreement; (3) failed to maintain the split rail fence that circles the Property and the bridges within the Park in accordance with the terms of the Agreement; (4) failed to ensure that the

20

commemorative signage identified in the Agreement is posted at each entrance to the Park; and (5) failed to post weight limits for the bridges within the Park.

82.     Because the City's breaches have prevented the citizens of the City and Audrain County from using and enjoying the full scope of the Park, the City's breaches relate to the fundamental basis for Green Estate's conveyance of the Property and therefore constitute breaches of material terms of the Agreement.

83.     Green Estate has been damaged as a result of the City's violations of the Agreement because the City has thwarted Green Estate's intent in entering the Agreement—i.e., ensuring that the Park Land, as described in the Agreement, be maintained for the use and enjoyment of the citizens of the City and Audrain County while honoring the legacy of Allen P. Green and the Green family.

84.     Green Estate provided notice to the City of the material violations and contractual breaches discussed herein. More than 90 days have elapsed since Green Estate provided that notice, and the City's violations have not been corrected or addressed, nor has substantial progress been made toward correcting or addressing them.

85.     Green Estate respectfully requests all damages available by law for the City's breaches of contract, including but not limited to:

➢     Specific performance and/or injunctive relief, requiring the City to immediately cease its ongoing breaches of the Agreement discussed herein, and honor and perform its ongoing covenants and obligations set forth in the Agreement.

➢     Alternatively, a declaration that because the City has failed to correct or make substantial progress toward correcting its material violations of the Agreement within 90 days of Green Estate's notice of the violations, fee title did revert to and is now vested

in Green Estate with respect to the portions of the Property belonging to the City or any entity controlled by the City, pursuant to Green Estate's reversionary interest in the Agreement. See **Exhibit A** ¶ 4, Ex. 4.1(c)(7). The land to which fee title did revert to and is now vested in Green Estate and which Green Estate is the legal owner of—*i.e.*, the portions of the Property subject to Green Estate's reversionary interest—is described in **Exhibit C**, which is based upon the legal descriptions of the Property in the Agreement and the Deed.

➢ Green Estate's attorneys' fees and costs in connection with this action.

➢ Any other available relief that the Court deems just and proper.

**Count III – Declaratory Judgment (28 U.S.C. § 2201(a); R.S. Mo. § 527.010)**

86. Green Estate incorporates by reference the preceding allegations as if fully set forth herein.

87. Green Estate and the City executed the Agreement in November 2005, in which Green Estate agreed to convey the Property to the City in exchange for certain covenants, warrants, and restrictions on the City's use and development of the Property, which are detailed in the Agreement. *See* **Exhibit A** ¶¶ 4.1, 4.2, 4.4, Ex. 4.1(c).

88. The Agreement satisfies the requirements of R.S. Mo. § 432.070 for a valid contract with a city or municipal corporation: (1) the City has the power to enter into contracts for land (*see* R.S. Mo. § 77.010); (2) the consideration was to be performed after execution; and (3) the Agreement, including its consideration, is written and signed by the parties' authorized representatives.

89.     As the party to the Agreement, Green Estate has a legally protected interest in ensuring that the City honors the ongoing covenants, warrants, and restrictions that serve as the City's consideration in the Agreement.

90.     Green Estate conveyed the Property to the City and therefore performed its obligations pursuant to the Agreement.

91.     The City has breached its ongoing obligations under the Agreement in numerous ways. The City has (1) failed to dedicate, use, and maintain the Park Land and Development Land still under its control for public recreational use, including by (a) wholly neglecting Rabbit's Foot Lake and the two bridges at each end of the pond and allowing them to fall into disrepair; and (b) by failing to remove dead trees and adequately mow grassy areas, which has greatly reduced the total amount of grassy areas that the public can use recreationally; (2) expanded the maintenance shed in the Park to well beyond its footprint, in violation of the Agreement; (3) failed to maintain the split rail fence that circles the Property and the bridges within the Park in accordance with the terms of the Agreement; (4) failed to ensure that the commemorative signage identified in the Agreement is posted at each entrance to the Park; and (5) failed to post weight limits for the bridges within the Park.

92.     Because the City's breaches have prevented the citizens of the City and Audrain County from using and enjoying the full scope of the Park, the City's breaches relate to the fundamental basis for Green Estate's conveyance of the Property and therefore constitute breaches of material terms of the Agreement.

93.     Green Estate has been damaged as a result of the City's violations of the Agreement because the City has thwarted Green Estate's intent in entering the Agreement—*i.e.*, ensuring that the Park Land, as described in the Agreement, be maintained for the use and enjoyment of the

23

citizens of the City and Audrain County while honoring the legacy of Allen P. Green and the Green family.

94.     As a result of the City's breaches of contract and Green Estate's damage, there is a justiciable controversy between Green Estate and the City that is real, substantial, and ripe for judicial determination.

95.     Green Estate provided notice to the City of the material violations and contractual breaches discussed herein. More than 90 days have elapsed since Green Estate provided that notice, and the City's violations have not been corrected or addressed, nor has substantial progress been made toward correcting or addressing them.

96.     In connection with this claim, Green Estate respectfully requests the following declaratory relief pursuant to both 28 U.S.C. § 2201(a) and R.S. Mo. § 527.010:

> ➢     A declaration that the terms and conditions of the Agreement place upon the City a continuing obligation to comply with the restrictions, covenants, and warrants in the Agreement, including but not limited to maintaining the Park Land, as well as any Development Land that has not been developed by the City, solely for the public's recreational use in accordance with the Agreement's terms.

> ➢     A declaration that the terms and conditions of the Agreement required the City to (1) maintain Rabbit's Foot Lake and its immediately surrounding area, including the bridges at each end of the pond, for the public's recreational use; (2) mow the grass areas of the Park so that the grass areas can be used and enjoyed by the public and remove dead trees that impede the public's recreational use of the Park; (3) not expand the footprint of the maintenance shed located in the Park Land; (4) maintain the Churchill Gate and the Property's split rail fence and bridges in the condition they were in at the time of the 2005

24

conveyance; (5) ensure that each entrance to the Park contains the commemorative signage discussed in Paragraph 4.4 of the Agreement; and (6) post weight limits for the bridges within the Park.

➢        A declaration that the City's violations of the Agreement discussed herein are to "material terms" and/or "conditions" of the Agreement (*see* **Exhibit A** ¶ 4, Ex. 4.1(c)(7)).

➢        Alternatively, a declaration that because the City has failed to correct or make substantial progress toward correcting its material violations within 90 days of Green Estate's notice of the violations, fee title to the Property did revert to and vest in Green Estate and Green Estate holds fee title in and is the lawful owner of all portions of the Property belonging to the City or any entity controlled by the City, pursuant to Green Estate's reversionary interest in the Agreement. *See* **Exhibit A** ¶ 4, Agreement Ex. 4.1(c)(7). The land to which fee title did revert to and is now vested in Green Estate and which Green Estate is the legal owner of—*i.e.*, the portions of the Property subject to Green Estate's reversionary interest—is described in **Exhibit C**, which is based upon the legal descriptions of the Property in the Agreement and the Deed.

### Count IV – Action to Quiet Title

97.    Green Estate incorporates by reference the proceeding allegations as if fully set forth herein.

98.    Green Estate and the City executed the Agreement in November 2005, in which Green Estate agreed to convey the Property to the City in exchange for certain ongoing covenants, warrants, and restrictions on the City's use and development of the Property, which are detailed in the Agreement. *See* **Exhibit A** ¶¶ 4.1, 4.2, 4.4, Ex. 4.1(c).

99.     The Agreement satisfies the requirements of R.S. Mo. § 432.070 for a valid contract with a city or municipal corporation: (1) the City has the power to enter into contracts for land (*see* R.S. Mo. § 77.010); (2) the consideration was to be performed after execution; and (3) the Agreement, including its consideration, is written and signed by the parties' authorized representatives.

100.     Green Estate conveyed the Property to the City and therefore performed its obligations pursuant to the Agreement.

101.     The City has breached its ongoing obligations under the Agreement in numerous ways. The City has (1) failed to dedicate, use, and maintain the Park Land and Development Land still under its control for public recreational use, including by (a) wholly neglecting Rabbit's Foot Lake and the two bridges at each end of the pond and allowing them to fall into disrepair; and (b) by failing to remove dead trees and adequately mow grassy areas, which has greatly reduced the total amount of grassy areas that the public can use recreationally; (2) expanded the maintenance shed in the Park to well beyond its footprint, in violation of the Agreement; (3) failed to maintain the split rail fence that circles the Property and the bridges within the Park in accordance with the terms of the Agreement; (4) failed to ensure that the commemorative signage identified in the Agreement is posted at each entrance to the Park; and (5) failed to post weight limits for the bridges within the Park.

102.     Because the City's breaches have prevented the citizens of the City and Audrain County from using and enjoying the full scope of the Park, the City's breaches relate to the fundamental basis for Green Estate's conveyance of the Property and therefore constitute breaches of material terms of the Agreement.

103.    Green Estate provided notice to the City of the material violations and contractual breaches discussed herein. More than 90 days have elapsed since Green Estate provided that notice, and the City's violations have not been corrected or addressed, nor has substantial progress been made toward correcting or addressing them.

104.    As a result of the City's material breaches of the Agreement and failure to correct those breaches within 90 days of receiving notice of them, fee title did revert to and is vested in Green Estate and Green Estate is the lawful owner of all portions of the Property belonging to the City or any entity controlled by the City, pursuant to Green Estate's reversionary interest in the Agreement. *See* **Exhibit A** ¶ 4, Ex. 4.1(c)(7).

105.    The City is in current possession of the Property and claims an interest and title to the Property, and is therefore adverse to Green Estate.

106.    Pursuant to R.S. Mo. § 527.150.1:

Any person claiming any title, estate or interest in real property, whether the same be legal or equitable, certain or contingent, present or in reversion, or remainder, whether in possession or not, may institute an action against any person or persons having or claiming to have any title, estate or interest in such property, whether in possession or not, to ascertain and determine the estate, title and interest of said parties, respectively, in such real estate, and to define and adjudge by its judgment or decree the title, estate and interest of the parties severally in and to such real property.

107.    Green Estate asserts this claim under R.S. Mo. § 527.150.1 for the Court to declare, ascertain, determine, define, and/or adjudge that fee title did revert to and is vested in Green Estate and Green Estate is the lawful owner of all portions of the Property belonging to the City or any entity controlled by the City, pursuant to Green Estate's reversionary interest in the Agreement (*see* **Exhibit A** ¶ 4, Ex. 4.1(c)(7)), and that the City accordingly holds no title or any interest in such areas of the Property. The land to which fee title did revert to and is now vested in Green Estate and which Green Estate is the legal owner of—*i.e.*, the portions of the Property subject to

27

Green Estate's reversionary interest—is described in **Exhibit C**, which is based upon the legal descriptions of the Property in the Agreement and the Deed.

### Count V – Common Law Dedication

108.    Green Estate incorporates by reference the proceeding allegations as if fully set forth herein. This Count V is brought in addition to and in the alternative to Green Estate's claims premised on a breach of contract.

109.    When Green Estate conveyed the Property to the City, it did so with an express intention that the Park Land "shall remain and be exclusively for 'public recreational use,'" and "shall be dedicated to and exclusively used for recreational use by the public and citizens of the City of Mexico, Missouri as a park, arboretum, and natural area." *See* **Exhibit A**, Ex. 4.1(c); *see id.* ¶ 4.1.

110.    The City accepted the Property, including the Park Land, on the terms set forth in Green Estate's dedication. The City then established "Green Estate Park" on the area specified in the Agreement as the Park Land, and after the dedication the public used the Park for recreational purposes.

111.    But the City has now diverted from the terms of Green Estate's dedication of land by failing to ensure that all of the Park Land is adequately maintained as a park suitable for public recreational use. The City has wholly neglected Rabbit's Foot Lake and the two bridges at each end of the pond, such that neither the pond nor the bridges are suitable for public recreational use. The City has also failed to remove dead trees or adequately mow grassy areas, which has greatly reduced the total amount of grassy areas that the public can use recreationally.

112.    Green Estate respectfully requests all damages available by law for the City's violation of Green Estate's common law dedication, including but not limited to:

➢ Specific performance and/or injunctive relief, requiring the City to immediately ensure that the entirety of the Park Land is dedicated to the uses for which Green Estate's dedication was made. *See* **Exhibit A**, Ex. 4.1(c).

➢ Alternatively, a declaration and/or injunction that title to the Park Land revert back to Green Estate on the basis that the City's neglect of the Park Land (1) renders the City no longer able to fulfill the purpose of Green Estate's dedication of the Park Land, and/or (2) the neglect evidences that the City has legally abandoned the dedicated use of the Park Land. The legal description of the Park Land subject to this common law reversion is described in the Deed. *See* **Exhibit B** at 6.

➢ Green Estate's attorneys' fees and costs in connection with this action.

➢ Any other available relief that the Court deems just and proper.

WHEREFORE, Green Estate prays for judgment in its favor and against the City, and prays for relief in accordance with the requested relief described above in each individual Count, as well as its costs and reasonable attorneys' fees incurred in commencing and prosecuting this action, and any and all other available relief the Court deems just and proper.

Dated: August 6, 2026

Respectfully submitted,

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Jacob B. Simon*
Jacob B. Simon, #72128MO
Hannah E. Demand, #74911MO
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
*jacob.simon@bclplaw.com*
*hannah.demand@bclplaw.com*

***Attorneys for Plaintiff Green Estate, LLC***

29